UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA FOR THE USE OF SALINAS CONSTRUCTION, INC., et al., | CASE NO. C14-1963JLR |
| Plaintiffs, | ORDER |
| v. | |
| WESTERN SURETY COMPANY, et al., | |
| Defendants. | |

## I.  INTRODUCTION

This matter comes before the court on Defendants CJW Construction, Inc. and

Western Surety Company's (collectively, "Defendants") motion for judgment as a matter

of law pursuant to Federal Rule of Civil Procedure 50(b).  (JNOV Mot. (Dkt. # 88).)

Plaintiff Salinas Construction, Inc. ("Salinas") opposes that motion.  (1st JNOV Resp.

(Dkt. # 99); 2d JNOV Resp. (Dkt. # 105).)  The court has considered the parties'

1   submissions, the appropriate portions of the record, and the relevant law.[1]  Considering

2   itself fully advised, the court GRANTS Defendants' motion for judgment as a matter of

3   law, DIRECTS the Clerk to issue an amended judgment in accordance with the jury's

4   verdict and this order, LIFTS the stay of execution of judgment and the requirement that

5   CJW maintain its supersedeas bond, and DENIES both motions for bills of costs

6   WITHOUT PREJUDICE to renewing those motions within 21 days of the entry of an

7   amended judgment.

8                           **II.    BACKGROUND**

9         This case involves a contractual dispute between CJW, a general contractor, and

10   Salinas, the subcontractor that CJW hired to pour concrete at a project at Joint Base

11   Lewis-McChord.[2]  (Compl. (Dkt. # 1) ¶ 1.1.)  Salinas asserted that CJW breached the

12   parties' subcontract in multiple manners, and CJW brought a counterclaim for breach of

13   the same subcontract.  (*See* Jury Instr. (Dkt. # 66) at 16-19.)  The only theory of breach at

14   issue in the instant motion is Salinas's claim that "CJW interfered with and hindered

15   Salinas's performance of its work at the project" (Salinas's "interference claim").  (*Id.* at

16   16; JNOV Mot. at 1.)  Salinas sought $425,388.00 from Defendants based on its

17   interference claim.  (Salinas Trial Br. (Dkt. # 47) at 11.)

18   _____

19         [1] Defendants have requested oral argument, whereas Salinas has not.  (Mot. at 1; Resp. at

20   1.)  The court concludes that oral argument is unnecessary and denies Defendants' request.  *See* Local Rules W.D. Wash. LCR 7(b)(4).

21         [2] In addition to CJW and Salinas, two sureties are parties to this suit.  Western is CJW's surety on its payment bond associated with the project.  (Pretrial Order (Dkt. # 58) at 3.)

22   Counterclaim-Defendant Fidelity and Deposit Company of Maryland is Salinas's surety on its performance bond.  (*Id.* at 4.)

1       The parties tried the case before a jury from March 14 to March 18, 2016. (*See*

2   Dkt. ## 60-63, 65.) After Salinas and Western rested, Defendants moved for judgment as

3   a matter of law pursuant to Federal Rule of Civil Procedure 50(a). (Trial Tr. (Dkt.

4   ## 92-96) at 658:13-662:24.)[3] Defendants characterized Salinas's interference claim as

5   resting on three bases: (1) failure to provide concrete at the contractually required rate of

6   150 cubic yards per hour; (2) failure to properly prepare subgrade; and (3)

7   weather-related issues caused by CJW's delays. (*Id.* at 658:13-21.) Defendants argued

8   that Salinas presented only parol evidence of a 150-cubic-yards-per-hour concrete

9   production rate and that Washington law foreclosed the jury's consideration of parol

10  evidence. (*Id.* at 658:22-660:8.) In addition, Defendants contended that Salinas

11  presented insufficient evidence of breach to support its subgrade-related argument and

12  insufficient evidence of a contractual obligation to work consecutive days to support its

13  weather-related argument. (*Id.* at 660:9-662:24.) Defendants therefore sought judgment

14  as a matter of law on Salinas's interference claim. The court took Defendants' initial

15  Rule 50(a) motion under advisement.

16      Defendants renewed their Rule 50(a) motion at the conclusion of the evidence.

17  (*Id.* at 890:6-892:25.) Besides reiterating and expanding on the grounds for their initial

18  Rule 50(a) motion (*id.* at 890:6-8, 892:6-24), Defendants argued that the damages

19  evidence presented by Salinas was "entirely unreliable" and failed to "establish any

20  

21      [3] The trial transcript is docketed in five separate entries—one for each day of trial—but
those entries are consecutively paginated from page 1 to page 981. (*See* Dkt. ## 92-96.) The
court's citations to the trial transcript refer to the consecutive pagination and do not differentiate

22  between docket entries.

1  causal connection between inefficiency damages and productivity" (*id.* at

2  890:17-891:10).  The court took Defendants' renewed and supplemented Rule 50(a)

3  motion under advisement.

4      On March 18, 2016, before the court ruled on Defendants' Rule 50(a) motion, the

5  jury returned a verdict that found partially for Defendants and partially for Salinas and

6  Fidelity.  (Verdict Form (Dkt. # 68) at 1-5.)  On Salinas's interference claim, the jury

7  found CJW liable for $216,300.00.  (*Id.* at 2.)  Of that amount, the jury found Western

8  jointly liable for $188,100.00.  (*Id.* at 3; *see also* Judgment (Dkt. # 70) at 1.)  The court

9  then denied Defendants' Rule 50(a) motion as moot, but without prejudice to renewing

10  the motion under Rule 50(b).  (3/21/16 Order (Dkt. # 69) at 2 & n.1 (citing Fed. R. Civ.

11  P. 50).)

12      Following the jury's verdict, Defendants renewed their motion for judgment as a

13  matter of law.  (JNOV Mot.)  On the same bases as they argued in their Rule 50(a)

14  motions, Defendants contend that the evidence does not support the jury's finding on

15  Salinas's interference claim.  (*Compare id.* at 3-11 *with* Trial Tr. at 658:13-662:24,

16  890:6-8, 890:17-891:10, 892:6-24.)  Salinas opposes that motion.[4]  (2d JNOV Resp.)

17  Defendants' Rule 50(b) motion is now before the court.

18

19

20  [4] Salinas's response, as initially filed, was "replete with general and specific factual
assertions without citation to the record" and lacked "a single citation to the trial transcript."
(6/14/16 Order (Dkt. # 103) at 2 & n.1 (citing 1st JNOV Resp.).)  Accordingly, the court granted
21  Salinas "leave to file a memorandum providing citations to the record—docket number(s),
page(s), and line(s)—for every factual assertion made in its brief."  (*Id.* at 3.)  Salinas
22  supplemented its initial response with a filing that mirrored its initial response but added
citations to the record.  (*Compare* 1st JNOV Resp. *with* 2d JNOV Resp.; *see also* Cox Decl.

ORDER- 4

1

### III.    ANALYSIS

2

**A.    Legal Standard**

3      The court may grant Defendants' renewed motion for judgment as a matter of law

4  if it "finds that a reasonable jury would not have a legally sufficient evidentiary basis" to

5  find for Salinas. Fed. R. Civ. P. 50(a)-(b).  The court must view the evidence and draw

6  all reasonable inferences in favor of Salinas.  *Ostad v. Or. Health Sci. Univ.*, 327 F.3d

7  876, 881 (9th Cir. 2003).  Granting a motion for judgment as a matter of law is proper if

8  "the evidence permits only one reasonable conclusion, and the conclusion is contrary to

9  that reached by the jury."  *Id.*  Judgment as a matter of law "is appropriate when the jury

10  could have relied only on speculation to reach its verdict."  *Lakeside-Scott v. Multnomah*

11  *Cty.*, 556 F.3d 797, 802-03 (9th Cir. 2009).

12      Because it is a renewed motion, a proper post-verdict motion for judgment as a

13  matter of law is limited to grounds asserted in the movant's pre-deliberation Rule 50(a)

14  motion.  *EEOC v. GoDaddy Software, Inc.*, 581 F.3d 951, 961-62 (9th Cir. 2009).  Thus,

15  a party cannot properly raise arguments in its post-trial motion under Rule 50(b) that it

16  did not raise in its pre-verdict Rule 50(a) motion.  *Id.* (citing *Freund v. Nycomed*

17  *Amersham*, 347 F.3d 752, 761 (9th Cir. 2003)).  The standard recited above therefore

18

19  (Dkt. # 106) ¶ 5, Ex. D (showing the differences between Salinas's initial response and its
   supplemental response by providing a redlined version).)

20          The court also granted Defendants leave to reply to Salinas's supplemental response.
   (6/14/16 Order at 3.)  Defendants argued in reply that Salinas's added citations "only further
   prove that CJW's Rule 50(b) [sic] should be granted."  (2d JNOV Reply (Dkt. # 107) at 1.)

21  Nowhere do Defendants object to the court's consideration of Salinas's supplemental response.
   (*See generally id.*)  In the interest of ruling based on a full record, the court treats Salinas's
   supplemental response (*see* 2d JNOV Resp.) as the operative brief in opposition to Defendants'

22  Rule 50(b) motion.

1  applies to the issues properly preserved in Defendants' Rule 50(a) motion and renewed in

2  Defendants' Rule 50(b) motion.

3  **B.    Defendants' Rule 50(b) Motion**

4         Salinas presented evidence of inefficiency damages on its interference claim

5  through only one witness—John Salinas II.  Defendants contend, as they did before and

6  during trial, that Mr. Salinas II was not disclosed or qualified as an expert witness but

7  provided expert—and therefore inadmissible—testimony under the Federal Rules of

8  Evidence.  (JNOV Mot. at 8 (citing Fed. R. Evid. 702).)  Defendants argue the court

9  should disregard Mr. Salinas II's damages testimony and conclude there was insufficient

10  admissible evidence before the jury to support an award of damages on Salinas's

11  interference claim.  (*Id.* at 11.)  For the reasons articulated below, the court agrees.[5]

12         1.   Mr. Salinas II's Calculations

13         "A claim of lost productivity is a claim arising out of a delay of a construction

14  project that causes a contractor to alter its method of performance so as to proceed in a

15  less productive manner . . . ."  *Net Constr., Inc. v. C & C Rehab & Constr., Inc.*, 256

16  F. Supp. 2d 350, 354 (E.D. Pa. 2003) (citing *Luria Bros. & Co. v. United States*, 369 F.2d

17  701 (1966)).  The measured-mile method is one technique for calculating

18  lost-productivity damages.  *See Safeco Ins. Co. of Am. v. Cty. of San Bernardino*, 347 F.

19  App'x 315, 318 (9th Cir. 2009) (holding that the "district court also did not commit clear

20  error by accepting the [plaintiff's] expert's measured-mile analysis and method of

21  _____

22         [5] The court declines to rule on the remaining bases that Defendants contend entitle them to judgment as a matter of law on Salinas's interference claim.  (*See generally* JNOV Mot.)

ORDER- 6

1    identifying impacted and unimpacted days" to calculate lost-productivity damages).

2    "The measured mile method is a technique whereby an unimpacted period or area or

3    activity of construction work is compared with another period or area or activity of

4    construction work that has been disrupted, the assumption being that the difference

5    between the labor or equipment hours expended per unit of work performed in the

6    unimpacted and impacted periods represents the loss to the contractor due to the impact

7    or disruption for which another party is responsible." Lee Davis et al., *Does the*

8    *"Measured Mile" Measure Up? When It Has, When It Hasn't, and What May Happen*

9    *Under* Daubert/Kumho, Construction Briefings No. 2007-4 (April 2007); (*see also*

10   Knudsen Decl. (Dkt. # 42) ¶ 7, Ex. D at 1.)[6]

11       Salinas sought $425,388.00 in "damages for the inefficiencies it suffered" based

12   on CJW's alleged interference. (Salinas Trial Br. at 11.) Mr. Salinas II calculated that

13   amount by performing a variation of measured-mile analysis. First, Mr. Salinas II

14   calculated the rate at which Salinas received concrete each day. He began by reviewing

15   "batch tickets" for each day of the project. (Trial Tr. at 437:13-15, 489:11-12.) The

16   batch tickets stated the cumulative quantity of concrete produced on a given night. (*Id.* at

17

18       [6] *See also* 17 No. 9 Nash & Cibinic Rep. ¶ 47 (Sept. 2003) ("The measure [sic] mile
     technique compares the productivity of labor in the period that has been impacted by the change,
19   differing site condition, or acceleration (the 'impacted period') with the productivity in some
     period where normal productivity was accomplished (the 'measured mile'). Ideally, the work
     done in the impacted period will be the same type of work as that done in the measured mile and
20   both periods will be taken from performance of the contract under which the claim is submitted.
     However, the technique has also been used when such perfect data is not available."); 5 Bruner
21   & O'Connor Construction Law § 15:116 ("Under this approach, the contractor's actual
     productivity in performing individual items of work during 'normal' periods prior to and after
     occurrence of the impacting event are compared with actual productivity during the abnormally
22   disrupted period.").

ORDER- 7

437:1-13; 438:24-439:12.)  Mr. Salinas II took the batch ticket that indicated the highest

cumulative total for the evening and made several adjustments to the cubic yards

indicated on the ticket.  (*Id.* at 439:13-25.)  For instance, Mr. Salinas II subtracted from

the total cubic yards delivered the approximate number of cubic yards that a separate

report indicated were "rejected."  (*Id.* at 439:17-442:16, 489:12-13; *see also id.* at

442:17-443:19 (explaining how Mr. Salinas II adjusted for "under-yield").)  These

computations yielded a total amount of concrete delivered to Salinas each day.

Mr. Salinas II then divided the amount of concrete that Salinas received on each

day by the time spent producing concrete on that day.  (*Id.* at 489:15-17.)  Mr. Salinas II

found that over the final three days of the project—March 24, March 31, and April 1—

CJW provided concrete at 143 cubic yards per hour.  (*Id.* at 489:24-490:1.)  In contrast,

over the previous 28 days of the project, CJW provided only 122 cubic yards of concrete

per hour.  (*Id.* at 489:18-23.)  Although neither number reached the 150 cubic yards per

hour that Salinas asserts CJW was contractually obligated to provide, Mr. Salinas

characterized the 143 cubic-yards-per-hour rate as "close enough," in contrast to the 122

cubic-yards-per-hour rate.  (*Id.* at 490:4-12.)

Mr. Salinas II also calculated several other values for each date of the project:  the

total square footage paved (*id.* at 475:22-476:13), the trucking costs Salinas incurred (*id.*

at 476:14-479:6), the labor costs Salinas incurred (*id.* at 479:7-480:8), and the equipment

costs Salinas incurred (*id.* at 480:9-13; *see also id* at 480:14-482:3 (clarifying that Mr.

Salinas II performed the above calculations for each day)).  Mr. Salinas II then added the

total costs of trucking, labor, and equipment for each day and divided that amount by the

1   square footage paved that day.  (*Id.* at 480:17-21.)  This calculation yielded a total cost

2   per square foot for each day that Salinas performed machine paving at the project.  (*Id.* at

3   481:20-482:3, 483:7-12.)

4       Mr. Salinas II then compared daily cost-per-square-foot rates in an effort to

5   determine what costs were caused by CJW's breach of contract.  Mr. Salinas II

6   characterized March 24, March 31, and April 1—the final three days on the project—as

7   "magically" proceeding how he "believed [the project] should have gone."  (*Id.* at

8   483:16-484:6.)[7]  In addition, Mr. Salinas II's prior calculations showed that CJW

9   provided 143 cubic yards of concrete per hour on those days, in contrast to 122 cubic

10  yards of concrete per hour on the other days of work on the project.  (*Id.* at

11  489:18-490:12.)  Mr. Salinas II therefore treated the final three days as the unimpacted

12  days and the cost per square foot on those three days as his measured mile; he treated the

13  remaining 28 days of the project as impacted by CJW's breach.  (*Id.* at 483:24-484:11.)

14  To calculate the inefficiency damages that Salinas incurred, Mr. Salinas II averaged

15  Salinas's cost per square foot on the unimpacted days and concluded that the unimpacted

16  cost was $1.15 per square foot.  (*Id.* at 484:7-11.)  He then multiplied $1.15 by the square

17  _____

18      [7] (*See also* Trial Tr. at 485:16-20 ("[On March 24, w]e finished up, I believe, in
    something like eight hours and 15 minutes of placing time.  There's an infill lane and a stand-up

19  lane.  It just -- it went quick.  The weather was nice.  We had no problems with subgrade.  I don't
    know.  It felt different."), 487:18-488:8 (stating that on April 1, the subgrade condition was

20  "[t]otally fine," the weather was "sunny for a little bit," and the concrete was produced at a
    "faster" rate), 541:22-24 ("I simply looked at the days that I thought went well and compared

21  them against the days that I thought did not go well."), 558:11-13 ("They were the days in which
    it seemed like the job, in my opinion, went how we had seen it going."), 558:18-21 (confirming

22  that "the three best costs per square foot were the three days that [Mr. Salinas II] chose as [his]
    three days of measured mile")).

1  footage paved on each of the impacted days to obtain the costs that Salinas would have

2  incurred but for CJW's breach.  (*Id.*)

3        To calculate lost-productivity damages, Mr. Salinas II subtracted those

4  hypothetically unimpacted costs for each impacted day from the actual costs that Salinas

5  incurred on that day.  (*Id.*)  Mr. Salinas II intended for this calculation to approximate

6  inefficiency damages for each impacted day on the project.  (*See id.*)  By adding up these

7  lost-productivity costs for each impacted day, Mr. Salinas II obtained $340,310.50 in

8  additional trucking, labor, and equipment costs incurred because of CJW's breach.  (*Id.* at

9  484:14-16, 488:15-19.)  Finally, Mr. Salinas II applied a 25 percent markup, which he

10 attests is standard in the industry to account for profit and indirect costs such as

11 management salaries and overhead.  (*Id.* at 484:14-16, 488:9-14, 488:20-489:5,

12 540:4-10.)  This calculation and some rounding yielded Salinas's final asserted damages

13 of $425,388.00 for its interference claim.  (*Id.* at 484:14-16; Salinas Trial Br. at 11.)

14       Mr. Salinas had never performed measured-mile analysis before performing the

15 calculations in this case.  (Trial Tr. at 542:8-16.)  He did not consult with any experts,

16 attend any seminars, or read any books, pamphlets, or other literature about the topic.

17 (*Id.* at 545:4-15.)  Indeed, Mr. Salinas did not characterize his calculations as

18 "measured-mile analysis" until he consulted with his "legal team."  (*Id.* at 545:25-546:1.)

19 After concluding the analysis, Mr. Salinas provided it to CJW as part of a pre-suit claim

20 for money owed.  (*Id.* at 395:4-15.)

21 //

22 //

2.  <u>Defendants' Prior Objections to Mr. Salinas II's Damages Testimony</u>

Defendants have repeatedly objected to Mr. Salinas II's damages testimony.  As between the parties, expert testimony on Salinas's alleged inefficiency damages arose at least as early as November 2015—several months before the issue came before the court. Prior to the expert disclosure deadline, Defendants informed Salinas that "any expert who would opine on Salinas' measured mile claim must be designated as an expert witness for Salinas' case-in-chief."  (Knudsen Decl. ¶ 2.)  Salinas responded that it "would consider whether to designate an expert witness on the measured mile claim."  (*Id.*)  In light of Salinas's indication, Defendants designated Bill Manginelli "to serve as an expert witness to rebut Salinas' measured mile claim."  (*Id.* ¶ 3.)  However, Salinas never designated an expert to testify on the issue.  (*See id.* ¶ 5; Prop. PTO (Dkt. # 39) at 5-6.)

On February 23, 2016, Defendants moved to exclude Mr. Salinas II's testimony. (MTE (Dkt. # 41) at 7-15.)  Defendants argued that expert testimony is required to perform the measured mile analysis that Mr. Salinas II utilized to calculate Salinas's damages on its interference claim.  (*Id.* at 7-11.)  However, Salinas never disclosed Mr. Salinas II as an expert witness, and Defendants contended he would be unqualified at any rate to testify as an expert on that issue.  (*Id.* at 11-14; *see also* Prop. PTO at 5-6.)

At a March 10, 2016, hearing, the court granted in part and denied in part Defendants' motion to exclude Mr. Salinas II's damages testimony.  Based in part on the opacity with which Mr. Salinas II's methodology had been presented to the court, the court declined to categorically exclude Mr. Salinas II's damages testimony.  Mr. Salinas II was a percipient witness to many relevant events.  His position at Salinas qualified him

1    to testify from personal knowledge and give lay opinion testimony based on basic

2    measurements and simple math.  However, the court agreed that Mr. Salinas II was

3    ineligible to provide expert testimony under Federal Rule of Evidence 702.

4           At the hearing, the court indicated that Mr. Salinas's trial testimony would be

5    subject to a motion to exclude if he ventured into territory reserved for expert testimony.

6    The court reserved for trial the determination of whether and when Mr. Salinas II's

7    opinion became too scientific, technical, or otherwise specialized to fall under Federal

8    Rule of Evidence 701.  *See* Fed. R. Evid. 701(c); Fed. R. Evid. 701 advisory committee's

9    note to 2000 amendment ("The amendment does not distinguish between expert and lay

10   witnesses, but rather between expert and lay testimony.  Certainly it is possible for the

11   same witness to provide both lay and expert testimony in a single case.").  In addition, the

12   court expressly declined to conclude whether Mr. Salinas II's lay testimony alone would

13   support a jury finding of damages on Salinas's interference claim.[8]

14          At trial, Defendants moved to strike Mr. Salinas II's "testimony surrounding Trial

15   Exhibit 4," which depicts Mr. Salinas II's inefficiency damages calculations, and the

16   exhibit itself.  (Trial Tr. at 680:9-11.)  The court denied that motion, concluding that Mr.

17   Salinas's trial testimony constituted lay opinion testimony and complied with Federal

18   Rule of Evidence 701.  (*Id.* at 680:14-18.)  Accordingly, the jury heard Mr. Salinas II's

19   conclusions regarding Salinas's inefficiency damages.

20

21          [8] At that juncture, the deadline for designating expert witnesses had passed and Salinas
22   had not retained an expert on inefficiency damages.  (*See* Dkt.; Prop. PTO at 5-6; MTE at 1-2;
     Knudsen Decl. ¶ 5.)

3.  <u>Admissibility of Mr. Salinas II's Damages Testimony</u>

Defendants maintain that Mr. Salinas II's testimony "crossed the line into application of hypothetical production rates for which his testimony could not qualify under [Federal] Rules [of Evidence] 701 or 702."  (2d JNOV Reply at 5; *see also* JNOV Mot. at 8-11.)  As a threshold matter, Salinas argues:

> [t]o the extent CJW argues the jury should not have heard John Salinas [II]'s testimony on damages, CJW attempts to rehash, yet again, its motion to the Court to strike [Mr. Salinas II]'s testimony to damages.  Rule 50(b) is inappropriate for this purpose.  Rule 50(b) is aimed at setting aside a jury verdict—not a court's evidentiary ruling.  CJW's options for challenging the Court's admission of [Mr. Salinas II]'s testimony and Exhibit 4 regarding Salinas's damages is reconsideration or appeal.  The issue is not properly resolved by motion under Rule 50(b).

(2d JNOV Resp. at 13).  The court disagrees with Salinas's argument, which cites no legal authority.

In *Weisgram v. Marley Co.*, 528 U.S. 440, 456 (2000), the Supreme Court affirmed a court of appeals' ability to conclude that a district court erroneously permitted expert testimony, exclude that expert testimony, and find "the properly admitted evidence insufficient to support the verdict."  *See also id.* at 457 ("We . . . hold that the authority of courts of appeals to direct the entry of judgment as a matter of law extends to cases in which, on excision of testimony erroneously admitted, there remains insufficient evidence to support the jury's verdict.").  The *Weisgram* Court only expressly addresses the authority of courts of appeals.  *Id.* at 456-57.  However, the Court's rationale—that "[i]nadmissible evidence contributes nothing to a 'legally sufficient evidentiary basis'"— applies with equal force to the district court's determination.  *Id.* at 454 (quoting Fed. R.

1  Civ. P. 50(a)) (citing *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S.

2  209, 242 (1993)).  District courts consider *Weisgram* to stand for the proposition that "in

3  determining whether there is a legally sufficient evidentiary basis for the verdict,

4  erroneously admitted evidence will play no role in the court's application of the

5  appropriate legal standard."  *Risk v. Burgettstown Borough, Pa.*, No. 05-1068, 2008 WL

6  4925641, at *2 (W.D. Pa. Nov. 14, 2008).[9]

7       The court therefore finds it necessary to consider Defendants' properly raised

8  objection to the admissibility of Mr. Salinas II's testimony before ruling on the

9  sufficiency of the evidence.  As Salinas acknowledges, prior to trial the court "limited

10  [Mr. Salinas II]'s [damages] testimony to actual costs and simple math."  (2d JNOV

11  Resp. at 13.)  In its March 10, 2016, oral ruling, the court acknowledged the lack of

12  clarity regarding Mr. Salinas II's methodology and indicated to Defendants that the court

13  may be persuaded after hearing testimony—including cross-examination—that Mr.

14  _____

15  [9] *See also Goebel v. Denver and Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir.
    2000) ("The district court may also satisfy its gatekeeper role when asked to rule on a . . .
16  post-trial motion."); *Accrenta, Inc. v. Staples, Inc.*, 851 F. Supp. 2d 1205, 1226-28 (C.D. Cal.
    2011) (citing *Weisgram*, 528 U.S. at 453) (considering previously raised *Daubert* challenges in
17  ruling on a Rule 50(b) motion), *vacated on other grounds*, 500 F. App'x 922 (Fed. Cir. 2013);
    *Smith v. City of Oakland*, 538 F. Supp. 2d 1217, 1224 (N.D. Cal. 2008) (citing *Weisgram*, 528
18  U.S. at 440) (entertaining the argument that in evaluating a Rule 50(b) motion, a district court
    can exclude improper testimony to which the movant objected at trial); *Etherton v. Owners Ins.*
19  *Co.*, 35 F. Supp. 3d 1360, 1365-73 (D. Colo. 2014) (considering but rejecting the movant's
    motion for judgment as a matter of law, which argued that integral expert testimony had been
20  improperly admitted); *Gavenda v. Orleans Cty.*, No. 95-CV-0251E(SC), 2000 WL 1375590, at
    *2 (W.D.N.Y. Sept. 21, 2000) (citing *Weisgram*, 528 U.S. at 453-56) ("[T]his Court is
21  authorized to excise evidence erroneously admitted at trial when rendering a decision on
    plaintiff's [Rule] 50 motion, inasmuch as [i]nadmissible evidence contributes nothing to a legally
22  sufficient evidentiary basis upon which to premise judgment as a matter of law." (internal
    quotations omitted) (third alteration in original)); *but see Dixon v. Int'l Harvester Co.*, 754 F.2d
    573, 580 (5th Cir. 1985).

1    Salinas II's conclusions required expert testimony.  Having reviewed the trial transcript,

2    the court finds that Mr. Salinas II's damages testimony went beyond actual costs and

3    simple math.  Mr. Salinas II entered the realm of expert testimony twice—when he chose

4    comparator dates by which to calculate Salinas's measured mile and when he concluded

5    that his calculations represented Salinas's inefficiency damages.

6         "Claims for lost productivity damages, based on the measured mile method or any

7    other method, normally require expert opinion testimony under [Federal] Rule [of

8    Evidence] 702 . . . ."  *Flatiron-Lane v. Case Atl. Co.*, 121 F. Supp. 3d 515, 543

9    (M.D.N.C. 2015) (quoting *S. Comfort Builders, Inc. v. United States*, 67 Fed. Cl. 124,

10   144 (2005)).  An expert is typically required to provide this testimony because "[t]he

11   measured mile approach to damages . . . estimates damages by comparing periods of

12   production that are unaffected by the contractor's alleged [defendant]-caused delay, with

13   periods during which delays affected its production adversely."  *Daewoo Eng'g &*

14   *Constr. Co. v. United States*, 73 Fed. Cl. 547, 580 (2006), *aff'd*, 557 F.3d 1332 (Fed. Cir.

15   2009).  One court has observed that

16        in every case the court has reviewed involving the measured mile method,
          an expert was required to apply the method.  This court has not found, nor
17        has [the plaintiff] cited, any case approving lay opinion for a measured mile
          analysis.  This method, like virtually every method of measuring lost
18        productivity, appears to require the opinion of an expert.  This is
          unsurprising.  The point of the method is to compare what actually
19        happened to a hypothetical universe where the defendant did not disrupt
          productivity.  The construction of hypothetical production rates, using
20        mathematical methods, is the hallmark of expert opinion testimony under
          [Federal] Rule [of Evidence] 702.

21

22

1   *Flatiron-Lane*, 121 F. Supp. 3d at 543-44.  The *Flatiron-Lane* court concluded that the

2   witness's measured-mile testimony was properly viewed as expert testimony and

3   excluded it for being improperly disclosed .  *Id.* at 544-45.

4        The *Flatiron-Lane* court's approach to the measured-mile method comports with

5   caselaw more broadly regarding expert testimony.  "The distinction between lay and

6   expert witness testimony is that lay testimony 'results from a process of reasoning

7   familiar in everyday life,' while expert testimony 'results from a process of reasoning

8   which can be mastered only by specialists in the field.'"  Fed. R. Evid. 701 advisory

9   committee's note to 2000 amendment (quoting *State v. Brown*, 836 S.W.2d 530, 549

10  (Tenn. 1992)); *see also Range Road Music, Inc. v. E. Coast Foods, Inc.*, 668 F.3d 1148,

11  1153 (9th Cir. 2012) (quoting the same language).  "Unlike a lay witness under [Federal]

12  Rule [of Evidence] 701, an expert can answer hypothetical questions and offer opinions

13  not based on first-hand knowledge because his opinions presumably 'will have a reliable

14  basis in the knowledge and experience of his discipline.'"  *Certain Underwriters at*

15  *Lloyd's, London v. Sinkovich*, 232 F.3d 200, 203 (4th Cir. 2000) (quoting *Daubert v.*

16  *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).

17       In prior briefing on this issue, Salinas resisted the persuasiveness of *Flatiron-Lane*

18  by positing that it rests on the "false premise that the measured mile method . . . requires

19  creating a 'hypothetical universe where the defendant did not disrupt productivity.'"

20  (MTE Resp. (Dkt. # 49) at 1 (quoting *Flatiron-Lane*, 121 F. Supp. 3d at 544).)  To the

21  contrary, Salinas argued, the measured mile "compares the *actual costs* incurred during

22  impacted and unimpacted (or nearly unimpacted) periods."  (*Id.* at 2 (emphasis in

1    original).)  The court disagrees with Salinas's characterization of Mr. Salinas II's

2    analysis.  Salinas is correct that Mr. Salinas II used actual costs to make his initial

3    cost-per-square-foot calculations for each day on the project.  (Trial Tr. at 475:22-482:3.)

4    But Mr. Salinas II then subjectively decided which costs to consider impacted versus

5    unimpacted and constructed a hypothetical world in which Salinas's work on every day

6    of the project went unimpacted by CJW's breach of contract.

7          To determine a baseline cost per square foot, unimpacted by CJW's breach of

8    contract, Mr. Salinas II had to select comparator days.  Mr. Salinas II chose March 24,

9    March 31, and April 1 as his comparators because work "magically" proceeded how Mr.

10   Salinas II "believed [the project] should have gone."  (Trial Tr. at 483:16-484:6.)  On

11   those days, concrete paving "went quick," the "weather was nice," and Salinas "had no

12   problems with subgrade."  (*Id.* at 485:16-20.)  Those days "felt different" to Mr. Salinas

13   II.  (*Id.* at 485:20.)  In sum, Mr. Salinas II chose those dates as comparators because the

14   job "went how [Salinas] had seen it going," but he made no adjustment to account for

15   differences or inefficiencies unrelated to CJW's interference.  (*Id.* at 558:9-13.)  The

16   three comparator days that Mr. Salinas II chose also had the lowest costs per square foot.

17   (*Id.* at 558:17-21.)

18         Mr. Salinas II averaged the cost per square foot on those three days and applied

19   that cost to the other, impacted days of work on the project.  In so doing, Mr. Salinas II

20   created a hypothetical first 28 days of the project in which Salinas's work was not

21   impacted by CJW's interference, based solely on the cost rate during the final three days

22

ORDER- 17

1  of the project.  By comparing this hypothetical 28 days to the real 28 days, Mr. Salinas II

2  estimated the inefficiency damages Salinas incurred on its interference claim.

3        The methodological flaws in Mr. Salinas II's analysis exemplify the reasons

4  inefficiency damages typically necessitate expert testimony.  *See Daewoo*, 73 Fed. Cl. at

5  581 ("[A] finder of fact faced with such a method of estimating damages would want to

6  have confidence in the experts' ability and objectivity.  A court would be particularly

7  concerned to know how the experts picked periods of productive and non-productive

8  construction for comparison."); 5 Bruner & O'Connor Construction Law § 15:116 ("The

9  difficulty in applying the 'measured mile' method is the need to exclude the impacts of

10  noncompensable disrupting events that can affect significantly the compared rates of

11  productivity.  It is uncommon that the compared periods utilized in any 'measured mile'

12  analysis truly are comparable in all respects, and care must be taken to assure meaningful

13  comparison of salient factors."); 17 No. 9 Nash & Cibinic ¶ 47 ("The measured mile

14  technique is a good way to prove loss of productivity . . . but it takes some data to

15  construct the measured mile analysis.  Moreover, there may be a need to adjust the data to

16  reflect differences between the impacted work and the measured mile work.  All of this is

17  generally a job for an expert who can demonstrate that the data has been used in a fair

18  and reasonable manner.").  Mr. Salinas II had no experience employing or reviewing

19  literature about the measured mile method.  (*Id.* at 542:11-16.)  Understandably, he did

20  not "take into account or make any reductions for any issues that were of Salinas's own

21  making."  (*Id.* at 559:20-23.)  He calculated the measured mile by choosing comparators

22  that "magically" proceeded how Mr. Salinas II "believed [the project] should have gone,"

1    rather than attempting to control for variables that did not relate to CJW's breach.  (*Id.* at

2    483:16-484:6.)

3          Because of its methodological shortcomings, Mr. Salinas II's approach treats

4    every difference between the unimpacted days and the impacted days as caused by

5    CJW's breach, which overstates Salinas's inefficiency damages to an indeterminate

6    degree.  Further, as the primary owner of Salinas, Mr. Salinas II selected as comparators

7    the three days most beneficial to Salinas.  (*Id.* at 558:17-21, 689:1-3 ("Salinas picked

8    their three best days, which happened to be the three last days of the project, and then

9    compared every other day to that.").)  Mr. Salinas II possessed neither the ability nor the

10   objectivity that "normally" leads courts to require an expert to perform this analysis.

11   *Flatiron-Lane*, 121 F. Supp. 3d at 543.

12         Defendants' expert, William Manginelli, attested to the flaws in Mr. Salinas II's

13   methodology.[10]  Mr. Manginelli reviewed Mr. Salinas II's calculations and the backup

14   thereto and concluded that Mr. Salinas II erred by failing to account for extraneous

15   variables and choosing as comparators the three days most beneficial to Salinas.  (Trial

16   Tr. at 685:1-4, 688:6-690:20.)  For instance, the variability in Salinas's costs per square

17   foot did not correlate with the rate at which CJW supplied concrete, but Mr. Salinas II did

18   not account or control for any other variables.  (*Id.* at 693:17-694:14; *see also id.* at

19   694:20-697:7 (performing a deeper analysis of the four days with the highest cost per

20   _____

21        [10] The court continues to view the evidence and draw all reasonable inferences in favor of
     Salinas.  *See Ostad*, 327 F.3d at 881.  The court finds Mr. Manginelli's testimony instructive

22   only in considering whether Mr. Salinas II's selection of comparators and final conclusions
     constitute expert testimony.

ORDER- 19

1   square foot and concluding that three were unrelated to the CJW's rate of concrete

2   provision).)  This testimony from Mr. Manginelli further illustrates why the selection of

3   comparators for measured-mile analysis necessitates expert testimony.  Had a properly

4   disclosed expert witness put forth the same testimony as Mr. Salinas II, the undisciplined

5   selection of comparators and deficient control for contributing factors would have

6   rendered that expert's testimony vulnerable to a *Daubert* challenge.  *See* Fed. R. Evid.

7   702 advisory committee's note to 2000 amendment.  The simplicity of Mr. Salinas II's

8   calculations, which Salinas has repeatedly argued support the lay nature of Mr. Salinas

9   II's testimony, only further highlights the shortcomings in Mr. Salinas II's methodology.

10      It follows from the above analysis that Mr. Salinas II's ultimate inefficiency

11  damages calculation was inadmissible pursuant to Federal Rules of Evidence 701 and

12  702.  Mr. Salinas II premised that conclusion on his selection of comparators.  (*See id.* at

13  488:15-16; *see also id.* at 488:20-489:5 (explaining Mr. Salinas II's rationale for marking

14  that amount up by 25 percent)); *supra* § III.B.1. (explaining Mr. Salinas II's

15  methodology).  Just as Salinas needed an expert to reliably select comparator days and

16  thereby perform the measured-mile analysis, only an expert was qualified to determine

17  that the result approximated Salinas's inefficiency damages.  *Cf. Safeco*, 347 F. App'x at

18  317 (rejecting a challenge to an expert's measured-mile analysis because the expert's

19  analytical shortcomings were "insignificant" and, under the governing law, "[l]iability

20  cannot be evaded because damages cannot be measured with exactness").  Accordingly,

21  the court concludes that Mr. Salinas II's final damages estimate and the embodiment of

22

1   that estimate in Trial Exhibit 4-087 constitute inadmissible expert testimony pursuant to

2   Federal Rule of Evidence 702.[11]

3          4.   <u>Sufficiency of Mr. Salinas II's Damages Testimony</u>

4          As the court indicated prior to trial, Mr. Salinas II was qualified to testify to actual

5   costs and simple math. His calculations of Salinas's daily trucking, labor, and equipment

6   costs per square foot paved constitute arithmetic based on personal knowledge and

7   business records and are therefore admissible as lay testimony. (*See* Trial Tr. at

8   475:22-482:3.) However, having determined that Mr. Salinas II's choice of comparators

9   and ultimate conclusions regarding inefficiency damages constituted inadmissible expert

10   testimony, these cost-per-square-foot calculations are the only admissible evidence of

11   damages before the jury. The court concludes this evidence fails to support the jury's

12   finding of damages. *See Weisgram*, 528 U.S. at 454 (quoting *Brooke Grp. Ltd.*, 509 U.S.

13

14

_____

15       [11] Salinas has also argued that Defendants "present no case law that deviates from the
16 well-established, black-letter law that says a plaintiff can attest to its own damages." (MTE
Resp. at 4 & n.12 (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993)).)
17 Such testimony "is admitted not because of experience, training or specialized knowledge within
the realm of an expert, but because of the particularized knowledge that the witness has by virtue
18 of his or her position in the business." Fed. R. Evid. 701 advisory committee's note to 2000
amendment; *see also* 5B Wash. Prac., Evidence Law & Prac. § 701.17 (5th ed.) (indicating that,
19 under Washington's evidence law, a party may "testify as to specific items of loss" and "state an
opinion on the value of the loss on any individual item" when "damages involve the loss of
20 property or damage to property"). Here, Mr. Salinas II possessed such "particularized
knowledge" regarding the data underlying his basic cost-per-square-foot calculations. The court
21 allowed Mr. Salinas II to present that testimony at trial and considers that testimony to be
admissible evidence for purposes of analyzing Defendants' Rule 50(b) motion. *See infra*
§ III.B.4. However, Mr. Salinas II lacks the expertise and objectivity required to effectively
22 choose comparators and factor out extraneous causes of inefficiency, and his ultimate analysis
therefore goes beyond Federal Rule of Evidence 701.

1    at 242) ("Inadmissible evidence contributes nothing to a 'legally sufficient evidentiary

2    basis.'").

3          The remaining evidence of inefficiency damages supports a verdict based, at most,

4    on "speculation or conjecture." *ESCA Corp. v. KPMG Peat Marwick*, 939 P.2d 1228,

5    1233 (Wash. Ct. App. 1997), *aff'd* 959 P.2d 651 (Wash. 1998); *cf. Gaasland Co. v. Hyak*

6    *Lumber & Millwork, Inc.*, 257 P.2d 784, 788-89 (Wash. Ct. App. 1953) (permitting a jury

7    to "make reasonable inferences based upon reasonably convincing evidence indicating

8    the amount of damage").  To conclude otherwise would incongruently permit a jury to

9    perform analysis for which the Federal Rules of Evidence require an expert.  Here, that

10   would require the jury to select comparator days and exclude costs unrelated to CJW's

11   breach—thereby generating a hypothetical world in which CJW did not breach its

12   contract—and determine a final damages estimate based upon those decisions and

13   calculations.  This analysis is beyond the purview of a jury, and even if a jury were

14   capable of such analysis, neither party presented evidence to the jury necessary to

15   selecting comparators and factoring out irrelevant inefficiencies.  As was the case

16   following Mr. Salinas II's testimony, the jury would be left to speculate what portion of

17   the inefficiencies on impacted days resulted from CJW's breach of contract as opposed to

18   other sources.

19         The court therefore concludes that insufficient admissible evidence of damages

20   supported the jury's verdict on Salinas's interference claim.

21   //

22   //

ORDER- 22

5. <u>Remedy</u>

Having found the evidence insufficient to support the jury's verdict, the court has discretion under Rule 50(b) to grant judgment as a matter of law or a new trial.  *See* Fed. R. Civ. P. 50(b)(2); *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 401 (2006) (quoting *Cone v. W. Va. Pulp & Paper Co.*, 330 U.S. 212, 218 (1947)).  The court concludes that judgment as a matter of law is appropriate.  Salinas has neither requested a new trial nor argued that a new trial would be a more appropriate outcome than judgment as a matter of law.  (*See generally* 2d JNOV Resp.)  Moreover, Salinas suffers no undue prejudice from granting Defendants judgment as a matter of law at this stage.

Salinas has been on notice since before the expert disclosure deadline of the potential need to present expert testimony on inefficiency damages.  *See Weisgram*, 528 U.S. at 456 (rejecting the argument that plaintiff "could have shored up [his] case[] by other means had [he] known [his] expert testimony would be found inadmissible" because the plaintiff "was on notice every step of the way that [the defendant] was challenging his experts" yet "made no attempt to add or substitute other evidence").  Indeed, Salinas considered designating an expert on inefficiency damages for its case-in-chief.  (Knudsen Decl. ¶ 2.)  Salinas declined to do so, instead relying on the admissibility of Mr. Salinas II's testimony.  (*Id.* ¶¶ 2, 5; Prop. PTO at 5-7.)

A review of the court's rulings on this issue likewise demonstrates no undue prejudice to Salinas.  When the parties first presented to the court their dispute over Mr. Salinas II's damages testimony, the court cautioned Salinas of the potential perils of its position.  In the court's March 10, 2016, pretrial ruling on Defendants' motion to exclude

ORDER- 23

1    Mr. Salinas II's damages testimony, the court permitted Mr. Salinas II to testify to basic

2    measurements and simple math but expressed doubt as to whether his testimony, so

3    limited, would support a jury's finding of inefficiency damages.  At that hearing, the

4    court also indicated that after hearing Mr. Salinas II's damages testimony at trial, it may

5    determine that Federal Rule of Evidence 702 precludes some portion thereof.  That

6    potentiality has come to fruition.  Despite receiving notice of this risk before trial, Salinas

7    did not designate an expert to testify to inefficiency damages.  Salinas therefore would

8    have been in no better position had the court granted Defendants' motion to strike on the

9    penultimate day of trial rather than excluding portions of Mr. Salinas II's inefficiency

10   damages testimony when ruling on Defendants' Rule 50(b) motion.  (*See* Prop. PTO at

11   5-6); *cf. Persinger v. Norfolk & W. Ry. Co.*, 920 F.2d 1185, 1189 (4th Cir. 1990) (finding

12   prejudice and inequity where a party established a reliance interest in the court's ruling

13   on the admissibility of its expert testimony and the trial court subsequently excluded that

14   testimony in granting a Rule 50(b) motion).

15            In sum, Salinas's "failure to buttress its position because of confidence in the

16   strength of that position [was] indulged in at [Salinas]'s own risk."  *Lujan v. Nat'l*

17   *Wildlife Fed'n*, 497 U.S. 871, 897 (1990).  The court therefore concludes that judgment

18   as a matter of law is appropriate rather than a new trial.

19                                    **IV.    CONCLUSION**

20            Based on the foregoing analysis, the court GRANTS Defendants' motion for

21   judgment as a matter of law and adjusts the jury's award of damages to vacate (1) the

22   $216,300.00 that CJW owed Salinas on Salinas's interference claim, and (2) the

ORDER- 24

1   $188,100.00 that Western owed Salinas on Salinas's interference claim.  The Court

2   DIRECTS the Clerk to issue an amended judgment in accordance with the jury's verdict

3   (Dkt. # 68) and this order.  The Court LIFTS the stay of execution of judgment and the

4   requirement that CJW maintain its supersedeas bond (Dkt. # 83, 87).  Because the

5   briefing on the pending motions for bills of costs implicates Salinas's damages award, the

6   court DENIES both motions (Dkt. ## 84, 85) WITHOUT PREJUDICE to renewing those

7   motions, pursuant to Local Civil Rule 54(d), within 21 days of the entry of an amended

8   judgment.

9          Dated this 7th day of July, 2016.

10

11

12   _____

13   JAMES L. ROBART
     United States District Judge

14

15

16

17

18

19

20

21

22

ORDER- 25